**Federal Defenders**
OF NEW YORK, INC.

Southern District
81 Main Street, Suite 300
White Plains, N.Y. 10601-4150
Tel: (914) 428-7124  Fax: (914) 948-5109

David E. Patton
*Executive Director
and Attorney-in-Chief*

Southern District of New York
Jennifer L. Brown
*Attorney-in-Charge*

June 8, 2023

The Hon. Kenneth M. Karas
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

      Re:   *United States v. Ahmad Khatab*, 23cr85(KMK)

Dear Judge Karas,

      I write to request a sentence of 30 months for Ahmad Khatab. This sentence punishes Mr. Khatab adequately while acknowledging the unusual aspects of his offense and recognizing the need for treatment.

      <u>PSR OBJECTIONS</u>

      a.  Criminal History Category

      The *Pimentel* letter in this case calculated Mr. Khatab's guidelines as 37 to 46 months (offense level 19; Criminal History Category III). This analysis reflected the criminal history records available to both parties. The PSR, however, found additional criminal history and calculated the guidelines as 46 to 57 months (offense level 19; Criminal History Category IV). Specifically, the PSR accorded Mr. Khatab 8 criminal history points (CHC IV). This is an error. He has 6 criminal history points (CHC III).

      On January 8, 2013, Mr. Khatab received the equivalent of five years of "Community Control" for the offenses outlined in Paragraphs 40 and 41 (receiving stolen property and breaking and entering). Both sentences were run concurrent. *Id*. Community Control is Ohio's version of probation. As part of Community Control, he spent six months in a *Community Based* Correctional Facility ("CBCF"). PSR ¶40 (emphasis added). Participation in the CBCF was a condition of his probation: "Ohio Community Based Correctional Facility programs are residential sanctions that provide local Court of Common Pleas a sanctioning *alternative* to prison." *See* www.drc.state.oh.us/OCSS/CBCF.pdf (emphasis added).

1

Following an intake and assessment period, residents of a CBCF are permitted to leave the facility for pre-approved purposes, such as job searching, registering in a vocational school or college, doctor visits, and NA/AA meetings. *See* http://cbcf.cuyahogacounty.us/en-US/What-is-a-CBCF.aspx. Once CBCF residents obtain employment or enrolls in school, they are permitted to leave the facility for scheduled work or school activities. *Id*. They are also permitted passes to visit with family. *Id*.

Sadly, Mr. Khatab did not take advantage of probationary services and absconded from supervision on September 16, 2013. PSR ¶¶40, 41. On March 26, 2014, he was arrested both on the fugitive warrant and on an arrest warrant for a burglary committed almost two years earlier (July 9, 2012). PSR ¶42.

The PSR states at Paragraph 40 that he received 379 days of incarceration on June 24, 2014. The case documents, however, indicate that Mr. Khatab may not have received jail time in connection with Paragraphs 40 and 41. Rather, the revocation document, signed June 24, 2014, states: "Revoke 379 days SUSP FTS (JTC 379) time served." *See* Exhibit F. Suspended time does not count toward criminal history. § 4A1.2(b)(2) ("If part of a sentence of imprisonment was suspended, 'sentence of imprisonment' refers only to the portion that was not suspended). Moreover, it does not appear that Community Control was actually revoked. In Exhibit G, the Court explains that Mr. Khatab's "Community Control need not be revoked at this time." *Id*. Moreover, Mr. Khatab was sentenced that same day (6/24/2014) to one yar of incarceration on the 2012 burglary.

Thus, the offenses outlined in Paragraphs 40 and 41 should garner only one criminal history point because the judgments imposed concurrent five-year probationary periods. While it appears that there may have been some jail time associated with these offenses, there is not enough information in the available record to conclusively determine what period of time constituted "time served."

B.     The Judiciary Sentencing Information ("JSIN") should not be included in the PSR and, in any case, should be disregarded by the Court.

There is an unresolved objection to the inclusion in the Presentence Report of data from the Judiciary Sentencing Information (JSIN) database. *See* PSR page 32. As noted in the PSR Addendum, the defense objects to the inclusion of JSIN data here as insufficiently reliable for the Court to take into account. Such statistical information is not listed in Federal Rule of Criminal Procedure 32 as one of the items that must be in a Presentence Report. More importantly, while properly-conducted statistical analysis may be quite relevant to sentencing in certain cases, the data as presented in this case are skewed upward and therefore misleading.

The PSR describes the JSIN sentencing data here as reliably applicable to defendants who are similarly situated to Mr. Khatab. PSR ¶ 30. But that description is incorrect for the following reasons:

1. The JSIN data includes only "length of imprisonment", rather than "sentence length," thereby excluding probationary sentences and alternatives to confinement from the data set. "When the United States Sentencing Commission publications refer to 'average sentence,' usually both alternative methods of confinement as well as sentences of probation are included. When, however, Commission documents refer to 'average length of imprisonment,' usually only prison sentences are included." Appendix B, USSC Codebook FY99-FY21. Because the JSIN excludes probationary sentences and alternative confinements, the data is likely skewed upward.

2. The JSIN accounts for "time served" sentences differently than probationary sentences, treating the number of months served prior to sentencing as the sentence intended by the judge, even if the intent of the judge was to impose a noncustodial sentence

3. Sentences with 5K1.1 departure are excluded. This exclusion skews the data away from "zero," even though the underlying conduct is arguably similar.

4. Career offenders and defendants facing mandatory minimums are automatically included

5. The JSIN gives no analysis of what "n" is sufficient. The number of defendants in this case may be sufficient for reliable results, but no analysis is provided to support that finding

6. The data presented here only include the last five years. It should instead include all the available data, going back at least ten years.

7. JSIN relies on different data than are publicly available from USSC or on additional unstated parameters. The Federal Defender Sentencing Resource Counsel analysts have tried and failed to replicate JSIN based on publicly-available information.

In sum, JSIN provides aggregate statistics for all defendants that fall in a particular guidelines cell (offense level and criminal history category), but the offenders included in this cell are not necessarily "similar" and there is no way to determine in which ways they are similar or dissimilar. On the contrary, for the reasons noted above, the data are skewed upward in a way that cannot be accounted for. Their inclusion in the report is therefore misleading and contrary to

an individualized assessment of defendants to be sentenced, as required under 18 U.S.C. § 3553(a) and the Due Process Clause. For these reasons, the Court should not place substantial weight on the JSIN data presented in the PSR in this case.

## SENTENCING ARGUMENT

Even if the Court finds that the properly calculated Guideline range is 46 to 57 months, a 30-month sentence is appropriate for the reasons set forth in 18 U.S.C. § 3553(a).

A. <u>The history and characteristics of the defendant augur in favor of a 46-month sentence</u>.



Ahmad also had to defend himself against his older brother, Khalaf, who often acted as Kheire's proxy. Khalaf was five years older than Ahmad, but that did not stop Khalaf from bullying Ahmad physically and verbally, taunting Ahmad about Khalaf's status as the favorite son. PSR ¶ 64.

---

[1] Dr. Nahu Abudabbeh, evaluation and CV attached at Exhibit B, is an Arabic-speaking Muslim psychologist who was hired to shed light on Ahmad's experience in a strict, Muslim household with a father who denied paternity. Dr. Abudabbeh was also able to interview his family members in Arabic.

Ahmad began using marijuana at age 12 to dull his pain and escape his world. By 14, he was using marijuana daily.

When Ahmad was 15, Khalaf called the police and alleged Ahmad was hitting his sister. Ahmad was arrested and taken to the police station. PSR ¶¶ 32, 66. His mother was in Jordan visiting family. His father flatly refused to come to court to pick up Ahmad, so Ahmad spent two months in a group home hoping his father would relent. Sadly, his father remained steadfast; but, Ahmad's best friend, Sean, rescued Ahmad. Sean's parents, who lived down the street from the Khatab family, welcomed Ahmad into their own home.

Unfortunately, Sean and his parents suffered from significant drug addictions and Ahmad fell head-first into their world: "He recounted that when he was in high school, the Berry's gave him pills while he lived with them, and they were both addicts." PSR ¶ 66. His sister, Rana, confirmed "the entire family was on drugs." PSR ¶ 89. For two years, Ahmad lived with the Berry's. He had no guidance, no supervision, and his court-sanctioned guardians gave him drugs.

At 16, still living at the Berry's, he began a dating a new girlfriend, who would later brag to Ahmad's sister that she (the girlfriend) "shot him up intravenously the first time." PSR ¶ 89.  This relationship was the starting point for his opiate addiction, which escalated into daily intravenous heroin use that still plagues him today. He is 36.

He dropped out of school around this time because "of drug use and trouble with law enforcement." PSR ¶ 91. For the next several years, he lived with his family of origin, used drugs, and had various low-level interactions with law enforcement, serving a few days in jail here and there. PSR ¶ 34 (criminal mischief; age 18; 19 days in jail); PSR ¶ 5 (negligent assault; age 18; 19 days in jail); ¶ 36 (drug possession; age 19; fine); PSR ¶ 37 (phone harassment; age 20; 13 days jail).

In 2010, Sean – his de facto brother – committed suicide. Ahmad was devastated. He felt hopeless and helpless. His criminal behavior escalated in tandem with his drug use. He served a few months-long prison sentenced in Ohio's Franklin County Jail. His mother passed away in 2012 from Hepatitis and Diabetes. Abudabbeh Report at 2. In 2015, Ahmad was convicted of a federal offense: robbing a bank without a gun in Illinois. PSR ¶ 43 (50 months' imprisonment; 2 years supervised release).

Tellingly (and importantly for the instant case), he excelled under federal supervision from June 28, 2019 to June 27, 2021. He completed the term successfully. For two full years, "he was employed, enrolled in school, and did not incur any new arrests." PSR ¶ 43 (as told by his United States Probation Officer

5

from the Southern District of Ohio). Ahmad also completed substance use treatment and tested negative 90% of the time. *Id.*

In 2019, he began a new relationship with Sharma Meadows. He fell in love with her and her young child, to whom he became close. Ahmad and Ms. Meadows had a child of their own in 2021, but by mid- 2021, the relationship had soured. Ahmad began using pills again, convincing himself if he only permitted himself one or two pills a day, he would not relapse, but "[h]is body was addicted before he knew it." Presentence Interview (Mar. 28, 2023).

In December 2021, he sought out mental health and substance abuse treatment from an inpatient hospital in Columbus, Ohio. PSR ¶ 87. There, he detoxed for five days and received a prescription for suboxone, but he did not receive any outpatient substance abuse treatment, therapy, or follow-up. Two months later, in February 2022, his beloved younger sister, Carmel, overdosed. She was 30. ▌y the date of the instant offense, April 14, 2022, Ahmad was fully addicted to opiates once again.

   B. <u>The nature and circumstances of the offense were unusual in that Mr. Khatab's employer had the gun for protection of a store in a low income area.</u>

On April 14, 2022, Ahmad Khatab was working at Pick and Go, a small market in a lower-income area in Columbus, Ohio. He had the job because his family friend owned the store. When interviewed the family friend (Mosab Dlaini) explained: "I know Ahmad's family. We look out for him. Dad left him alone. Mom passed. Sister passed. He just got out of jail." ATF interview Nov. 9, 2022.

Mr. Dlaini explained that he had two guns behind the counter in case the store was robbed. After the incident, Mr. Dlaini watched the video and confirmed that a customer went behind the counter where Ahmad was working. It appeared Ahmad felt threatened and grabbed a gun. The customer left immediately and called the police. *Id.*

Ahmad was on drugs at the time of the offense. His first inclination was to defend himself and the store. Notably, he did not bring these guns into the store. They were already there, courtesy of the store's owners. Ahmad did not purchase the gun, load the gun, or have the gun in connection with another felony offense. He had no idea that one of the guns was stolen. Indeed, the store owner was similarly surprised to discovery that fact. ATF interview Nov. 9, 2022. Ahmad should have handled the situation differently, but the nature and circumstances of the offense provide important context and differentiate the case from other § 922(g) convictions.

C. <u>The remaining 3553(a) factors augur in favor of a 30-month sentence; specifically, the need for treatment and his remorse.</u>

As noted above, Dr. Nahu Abudabbeh is an Arabic-speaking Muslim psychologist who was hired to shed light on Ahmad's experience in a strict, Muslim household with a father who denied paternity.

She conducted several tests, including the Adverse Childhood Experience Questionnaire.[2] This test is scored on a scale of 0 to 10. Individuals with a score of 4 or higher are at a higher risk of mental and physical health problems. Those with a 6 or higher are "are at risk of their lifespan being shortened by 20 years" because of mental and physical problems. Ahmad scored a 7 because he was exposed to "physical violence, neglect, witnessing domestic violence, and living with a family member who attempted suicide." Abudabbeh Eval'n at 4.

As predicted by the ACE Questionnaire, Ahmad ended up with mental and physical problems. PSR ¶ 77 ▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

On a positive note, Ahmad scored in the low range on The TCU Criminal Thinking Scales. *Id.* at 6. Specifically, Dr. Abudabbeh concluded: "He is not someone who feels entitled, he is not seeking power, he relates warmly and caringly toward others, he respects the justice system, and he takes responsibility for his actions." *Id.*

His criminal record, however, reflects his childhood traumas: "This is a man who was never given the tools to live a flourishing, orderly, and socially acceptable life. He grew up in a home where his judgmental, authoritarian, Muslim father accused Mr. Khatab's mother of cheating on him. This belief cast an incredibly poisonous atmosphere on the family." *Id.*

Dr. Abudabbeh explains:

The impact of the infidelity accusation levels at Ahmad's mother and the rejection of Mr. Khatab as a result, should be understood as the ultimate sin in the Muslim culture. In certain parts of the Muslim world, this type of accusation to date results in the woman being considered a whore and, in some cases, killed. Subsequently, his mother's role was significantly reduced so as to render it minimally effective as that of a protector....

---

[2] The test and an explanation thereof are available at https://developingchild.harvard.edu/media-coverage/take-the-ace-quiz-and-learn-what-it-does-and-doesnt-mean.

> This is the cloud under which Ahmad's family lived and suffered its consequences.

*Id*. at 7 (noting that drug addiction and criminal justice involvement have impacted Ahmad and many of his siblings).

The above diagnoses require mental health and substance abuse treatment. Ahmad is committed to both forms of therapy and ready to tackle the unrelenting physical and verbal trauma he incurred at home. He has gained a lot of insight into substance abuse during the last several months at Westchester County Jail. He explains:

> I see now how important it is to work on my substance abuse and begin to develop the tools necessary to cope with my triggers for using drugs. I want to continue my substance abuse treatment when I am released. I want to go to an outpatient treatment facility where I can attend groups and continue to receive Suboxone. Suboxone has helped me with opiate addiction and I recognize it is something I will have to take for the rest of my life. I understand my addiction is a disease, a disease similar to diabetes. Just like how a person with diabetes needs their insulin to live a healthy life, I need my Suboxone to live a drug free life.

Letter from Ahmad Khatab to Court (June 9, 2023), attached at Exh. A. Ahmad also recognizes that he "need[s] help coping with my issues and trauma, and not turn to drugs." He regrets deeply not completing RDAP during his prior federal bid. *Id*. ("It was a dumb decision that a younger me made."). He will not make that mistake again.

He is more motivated now because he wants to be sober for his stepson and biological son: " More importantly than doing it for myself, is doing it for my children." *Id*.

He intends to complete his barber degree, for which he has already completed 1800 hours and simply needs to take the mandatory final exam. PSR ¶ 91 (information confirmed by the Ohio State College of Barber Styling). He must complete the mandatory final exam by June 2025. A 30-month sentence will allow him time after release to brush up on his skills before the final test.

He also intends to remain an observant Muslim, which will provide structure and community. He writes: "Living a drug free lifestyle is crucial in order to be faithful Muslim. During my time here in Westchester County jail, I have begun to work hard on my faith and to think about what it is to be a Muslim that my community can be proud of." *Id*.

While some form of incarceration may be necessary, an extended period is not. He would benefit from the same manner of supervision imposed in the Northern District of Illinois. He had marked success during his two-year period of supervised release (6/28/2019 to 6/27/2021). This successfully-completed term can be replicated and augmented here in the Southern District of New York. PSR ¶ 4.

Moreover, Ahmad's most recent period of incarceration at the Westchester County Jail has been brutal and acted as an effective deterrent. Specifically, he has been housed for most of his pretrial incarceration in the notorious "old jail," built in 1932. The bathrooms are filled with mold, flies, and cockroaches. He is required to be locked in his cell for 17 hours a day. The cell has room only for a bed and a steel toilet. He has no access to sunlight as there is no outdoor space.

Finally, Ahmad accepted full responsibility immediately. He asked to plead guilty immediately in the southern District even though the case was supposed to be transferred to Ohio. He understands that he is serving a life sentence a few years at a time. This life is not what he imagined. He knows he can do better.

Thank you for your consideration of this request for a 30 month sentence.

Respectfully,

_____
Rachel Martin, Esq.
Assistant Federal Public Defender

cc:     Stephanie Simon, Esq.

## **EXHIBITS**

A. Letter to Court from Ahmad Khatab, defendant
B. Psychological Evaluation and CV
C. Letter to Court from Salam Khatab, sister
D. Letter to Court from Rana Khatab, sister
E. Letter to Court from Hamzah Mansour, friend
F. June 24, 2014 court document, Case No. 12cr122 (Ohio)
G. June 25, 2014 court document, Case No. 12cr122 (Ohio)